**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| SHEILA DAVIS, MELISSA WAY, and KEVIN ZITTA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>CITIZENS FINANCIAL GROUP, INC., COMPENSATION AND HUMAN RESOURCE COMMITTEE OF THE CITIZENS FINANCIAL GROUP, INC. BOARD OF DIRECTORS, CFG RETIREMENT COMMITTEE, and JOHN DOES 1-10,<br><br>Defendants. | ) | **NO.:** |

## CLASS ACTION COMPLAINT

Plaintiffs, Sheila Davis, Melissa Way, and Kevin Zitta ("Plaintiffs"), by and through their attorneys, on behalf of the CFG Retirement Savings Plan (the "Plan"), themselves and all others similarly situated, state and allege as follows:

## I. INTRODUCTION

1. This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Citizens Financial Group, Inc. ("Citizens" or "Company"), the Compensation and Human Resource Committee ("CHRC") of the Citizens Financial Group, Inc. Board of Directors (the "Board") and the CFG Retirement Committee and its members (the "Committee") during the Class Period.

2. The Plan is a defined contribution plan, established "for the exclusive benefit of the Eligible Employees and their beneficiaries." 2021 Plan Document, at Art. 1.2. Eligible participants make tax-deferred contributions from their salaries to the Plan.

3. To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Moitoso v. FMR LLC*, 2020 WL 1495938, at * 6 (D. Mass. Mar. 27, 2020) (quoting *Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009).

4. The Department of Labor ("DOL") has also explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, "establish a prudent process for selecting investment options and service providers." ; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5. The Supreme Court states that in interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Nw. Univ.*, 595 U.S. 170, 175, 142 S. Ct. 737, 741, 211 L. Ed. 2d 558 (2022).

6. Additionally, cost-conscious management is inherent in a fiduciary's obligation to continuously monitor all fees incurred by plan participants, including a plan's recordkeeping and administration ("RKA") fees.

7. Plaintiffs allege several causes of action related to the Plan fiduciaries' mismanagement of the Plan's investment menu and RKA fees.

8. With regard to the Plan's investments, Defendants breached their fiduciary duty of prudence by imprudently selecting and retaining certain funds on the Plan's investment menu. These funds include the following:

| **Fund Name** | **Short Name** | **Ticker Symbol** | **Asset Class** |
|---|---|---|---|
| Fidelity Freedom Index Commingled T[1] Target Date Fund Series | Fidelity TDF | NA[2] | Target Date Fund |
| | | | |
| Vanguard Institutional 500 Index Trust[3] | Van Inst 500 Indx | NA | Large Cap Blend |
| Vanguard Institutional Index Fund Institutional Plus Shares[4] | Van Inst Index Instl Pl | VIIIX | Large Cap Blend |
| | | | |
| Vanguard Institutional Total International Stock Market Index Trust[5] | Van Inst Tot Int'l Stk Mkt Indx | NA | Foreign Large Blend |
| Vanguard Total International Stock Index Fund Institutional Shares[6] | Van Tot In't Stk Indx Fd Inst | VTPSX | Foreign Large Blend |
| | | | |

[1] Commingled funds are also known as collective trusts or CITs.

[2] CITs do not have ticker symbols like mutual funds because CITs are traded via internal plan accounting instead of public exchanges. Other than this difference, CITs and mutual funds share many of the same attributes. Both vehicles gather money from multiple investors to purchase a diversified portfolio of underlying assets, such as stocks, bonds, or alternative investments; both are managed by professional investment teams or portfolio managers who execute a specific investment strategy; both calculate their Net Asset Value (NAV) daily and trade or price on a daily cycle; and a CIT often mirrors the exact same investment strategy or portfolio composition as its corresponding mutual fund.

[3] This was the Plan fund in 2023 and 2024.

[4] This was the Plan fund in 2020 through 2022.

[5] This was the Plan fund beginning in 2023.

[6] This was the Plan fund from 2020 to 2022.

| | | | |
|---|---|---|---|
| Vanguard Institutional Total Bond Market Index Trust[7] | Van Inst Ttl Bd Mkt Indx | NA | International Core Bond |
| Vanguard Total Bond Market Index Fund[8] | Van Tot Bd Mk Index | VBTIX | International Core Bond |

9. Together, these funds are referred to herein as the "Challenged Funds." For each of the Challenged Funds, there were better performing alternatives that were materially similar with superior investment metrics, but were not selected.

10. In other words, Defendants failed to independently review the Plan's investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance and quality.

11. With regard to RKA, Defendants breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to pay reasonable fees for RKA services and failing to defray reasonable costs.

12. At all times during the Class Period, the Plan had at least $1 billion in assets under management. At the Plan's fiscal year end in 2020, the Plan had $2,480,877,000 in assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See* 2020 Form 5500 for the Plan, Schedule H, at 12.

13. By the end of 2024, the Plan had $3,221,344,000 in assets under management. *See* 2024 Form 5500 for the Plan, Schedule H, at 14.

14. The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. In 2023, only 0.1

[7] This was the Plan fund beginning in 2022.

[8] This was the Plan fund from 2020 to 2021.

percent (1,005 of 721,950) of plans in the country had more than $1 billion in assets under management. In addition, this was true just before the start of the Class Period in 2020 where only 0.1 percent (892 of 616,050) of 401(k) plans in the country were as large as the Plan.

15. The Plan is also large in terms of the number of its participants. At the end of 2020, just before the start of the Class Period, the Plan had 22,702 participants with account balances. *See* 2020 Form 5500 for the Plan, at 2. By year end 2024, the Plan had 23,881 participants with account balances. *See* 2024 Form 5500 for the Plan, at 2.

16. The marketplace for retirement plan services is established and competitive. Accordingly, as a jumbo plan, in addition to the large number of participants, the Plan had substantial bargaining power to obtain high-quality, low-cost RKA services. Defendants, however, did not try to reduce the Plan's expenses to ensure they were prudent. Rather, Defendants allowed unreasonable expenses to be charged to participants for RKA services throughout the Class Period.

17. Relatedly, Defendants also breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by failing to "defray[] reasonable expenses of administering the [Plan]." 29 U.S.C. § 1104(a)(A)(ii). Their failure stems from the use of Plan participant forfeited funds from at least the start of the Class Period to the end of 2024, to reduce employer contributions to the Plan instead of using the funds to reduce or eliminate the amounts charged to Plan participants for Plan administrative costs. This action by the Defendants was a clear breach of the duties of prudence and loyalty to Plan participants and cost Plan participants millions of dollars.

18. Defendants also caused the Plan to enter into an arrangement with Great-West Life & Annuity Company ("Great-West"), a party in interest, under which Great-West/Empower received millions of dollars in exchange for recordkeeping services, trustee services, and other

services rendered to the Plan. Specifically, Defendants' conduct was egregious given that Great-West/Empower received additional income from certain of the Plan's investment securities. This arrangement with Great-West/Empower is a prohibited transaction because it "amounts to a 'direct or indirect ... furnishing of services ... between the plan and a party in interest,' 29 U.S.C. § 1106(a)(1)(C)." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

19. Defendants' overall mismanagement of the Plan constitutes a breach of the fiduciary duty of prudence in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

20. In sum, Plaintiffs allege Defendants, as "fiduciaries" of the Plan, breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of performance (inclusive of cost); (2) failing to control the Plan's recordkeeping and administration costs; (3) failing to prudently and loyally allocate the Plan's forfeiture account; and (4) engaging in prohibited transactions in violation of 29 U.S.C. § 1106 (a)(1)(C).

21. Based on Defendants' conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Counts I and 2), breach of the duty of loyalty (Count 3), failure to monitor fiduciaries (Count 4), and violation of ERISA's prohibited transactions (Count 5).

## II. JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29

U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

23. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

24. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III. PARTIES

### Plaintiffs

25. Plaintiff, Sheila Davis ("Davis"), resides in Quakertown, Pennsylvania. During her employment, Plaintiff Davis participated in the Plan. Ms. Davis invested in the Fidelity 2025 TDF and suffered injury to her Plan account due to the significant underperformance of the Fidelity TDFs. In addition, Plaintiff Davis also suffered injury to her Plan account by paying excessive RKA costs during the Class Period. Plaintiff Davis also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan administrative expenses which, if used to pay for administrative expenses, would have reduced or eliminated the amounts charged to Plaintiff Davis's individual account.

26. Plaintiff, Melissa Way ("Way"), resides in Canton, Ohio. During her employment, Plaintiff Way participated in the Plan. Ms. Way invested in the Plan's funds including the Van Inst Tot Int'l Stk Mkt Indx and the Van Tot In't Stk Indx Fd Inst, and suffered injury to her Plan

account due to the significant underperformance of these funds. In addition, Plaintiff Way also suffered injury to her Plan account by paying excessive RKA costs during the Class Period. Plaintiff Way also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan administrative expenses which, if used to pay for administrative expenses, would have reduced or eliminated the amounts charged to Plaintiff Way's individual account.

27. Plaintiff, Kevin Zitta ("Zitta"), resides in Henrico, Virginia. During his employment, Plaintiff Zitta participated in the Plan. Mr. Zitta invested in the Fidelity 2055 TDF and suffered injury to his Plan account due to the significant underperformance of the Fidelity TDFs. In addition, Plaintiff Zitta also suffered injury to his Plan account by paying excessive RKA costs. Plaintiff Zitta also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan administrative expenses which, if used to pay for administrative expenses, would have reduced or eliminated the amounts charged to Plaintiff Zitta's individual account.

28. Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their account currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

29. Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

30. Citizens is the Plan sponsor and Plan administrator with a principal place of business at One Citizens Bank Way, Johnston, Rhode Island. *See* 2020 Form 5500 of the Plan, at 1; *See also* 2021 Plan Document ("'Sponsor' means Citizens Financial Gorup, Inc., and any successor thereto which adopts the Plan.").

31. "Citizens Financial Group, Inc. is one of the nation's oldest and largest financial institutions, with $226.4 billion in assets as of December 31, 2025. Headquartered in Providence, Rhode Island, Citizens offers a broad range of retail, private banking, wealth management and commercial banking products and services to individuals, small businesses, middle-market companies, large corporations and institutions." https://www.citizensbank.com/about-us/our-company/overview.aspx

32. Citizens is identified as a named fiduciary with respect to the Plan along with other entities. *See* 2021 Plan Document, at Art. 17.1. In its capacity as Plan Administrator, Citizens acts through the CFG Retirement Committee discussed below. *Id.*

33. One of Citizens' primary duties is to appoint members of the Retirement Committee. *Id.* at Art. 17.2. The Committee serves "at the pleasure of the Sponsor" meaning Citizens has the responsibility to monitor the Committee and remove and replace members as it deems appropriate.

34. Accordingly, Citizens during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to oversee the actions of the Committee.

**CHRC Defendants**

35. The CHRC appoints members of the Committee. *See* Charter of the CFG Retirement Committee, executed January 6, 2025 ("Committee Charter"), at ¶ 2.

36. The CHRC may remove members of the Committee "with or without cause." *Id.* Specifically, "[a]ny Committee member may be dismissed at any time by the CHRC, whether his or her appointment is for a specified term or for an indefinite term, upon notice in writing delivered by the CHRC to the Committee member." *Id.*

37. The CHRC also retains the power to "appoint, monitor and remove, if necessary, the banks serving as trustee of the [Plan]." *Id.* at ¶ 7(b).

38. Accordingly, the CHRC during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to oversee the actions of the Committee.

**Committee Defendants**

39. The Committee consisted of "such number of members as the Sponsor" determined "from time to time." 2021 Plan Document, Art. 17.2.

40. At least as of January 6, 2025, the Committee consisted of "at least three (3) members, including a Chairperson." Committee Charter at ¶ 2.

41. "Any action taken by the Committee shall be by majority rule of the members of the Committee." 2021 Plan Document, Art. 17.3.

42. Under the Plan Document, the Committee had several duties including:

(1) To construe and interpret the Plan, decide all questions of eligibility and determine the amount and time of payment of any benefits hereunder;

(2) To determine any facts necessary for it to carry out its duties hereunder;

(3) To receive, review and keep on file (as it deems convenient or proper) reports of the financial condition, and of the receipts and disbursements, of the assets of the Plan;

(4) To direct the Trustee to pay reasonable expenses of the Plan and Trust out of Trust assets;

(5) To select appropriate investment vehicles, which may include collective investment funds, to constitute the Investment Funds available under the Trust for the investment of Plan assets, to permit Participants to direct investment of their account balances in the Investment Funds, and to prescribe rules and procedures relating to such directed investment;

(6) To select the Investment Fund or Funds to serve as the qualified directed investment alternative under the Plan; and

(7) To enter into any and all contracts and agreements for carrying out the terms of the Plan and the administration thereof, to select the Investment Funds available under the Trust and to do all acts as the Committee, in its sole discretion, may deem necessary or appropriate, and all such contracts, agreements, and acts shall be binding and conclusive on the parties hereto and on the Employees involved.

*See* 2021 Plan Document, Art. 17.5.

43. The Committee Charter states the Committee must provide "ongoing monitoring with respect to the investments of the [Plan] in the context of established standards of performance and taking whatever corrective action is deemed prudent and appropriate if objectives are not being met or if policies and guidelines are not being followed." Committee Charter, at ¶ 5(b).

44. The Committee is also required to monitor "the fees and expenses of the trustee, recordkeeper, any investment managers and/or advisors and any funds that are investments of the [Plan] and reviewing such fees and expenses for reasonableness." *Id.* at ¶ 5(d).

45. Each of the above responsibilities were to be "discharge[d] … with respect to the Plan[] solely in the interest of the Plan's participants and beneficiaries" and discharged "for the exclusive purpose of providing benefits to participants and beneficiaries, and defraying reasonable expenses of administering the Plan." *Id.* at ¶ 8.

46. The Committee had complete discretion to carry out its duties relating to selection and monitoring of investment funds, payment of RKA services, and the proper allocation of the Plan's forfeiture amounts, yet failed on every level of fiduciary process and execution related to these responsibilities.

47. For the foregoing reasons, the Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

48. The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Committee Defendants."

## IV. CLASS ACTION ALLEGATIONS

49. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the CFG Retirement Savings Plan, at any time between January 1, 2021 through the date of judgment (the "Class Period").

50. The members of the Class are so numerous that joinder of all members is impractical. The 2024 Form 5500 lists 23,881 Plan "participants with account balances as of the end of the plan year." 2024 Form 5500 for the Plan, at 2.

51. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

52. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A. Whether Defendants are/were fiduciaries of the Plan;

B. Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C. Whether the Company and CHRC failed to monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D. The proper form of equitable and injunctive relief; and

E. The proper measure of monetary relief.

53. Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

54. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

55. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V. THE PLAN

56. The Plan is a defined contribution plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. *See* Auditor's Report, attached to 2020 Form 5500 for the Plan, at 5.

***Eligibility***

57. In general, the Plan covers all employees of Citizens. *See* Summary Plan Description, Effective January 1, 2025 ("2025 SPD"), at 6. ("If you are a Colleague who works for a Participating Employer, you are eligible to join the CFG 401(k) Plan and begin making contributions as soon as administratively feasible after your hire date.").

58. Participants "are eligible to receive Employer Matching Contributions on the first payroll date after completing a year of service and are eligible to receive Employer Core Non-Elective Contributions for eligible pay received after the completion of a year of service." *See* 2025 SPD, at 6.

***Contributions***

59. Eligible employees may elect to make pre-tax and/or Roth IRA contributions to their Plan accounts from one to 50 percent of pay per payroll. *See* 2025 SPD at 6.

60. The Company makes matching contributions after completion of one year of service up to 4 percent (4%) of Plan participant pay. 2025 SPD at 8.

61. The Company also makes Employer Core Non-Elective Contributions equal to 1.5% of participant pay after completion of a year of service, provided the participant is employed on the last day of a Plan year. *Id.*

62. Like other companies that sponsor 401(k) plans for their employees, Citizens enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https:/www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

63. Citizens also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." See, https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

64. Given the size of the Plan, Citizens likely enjoyed significant tax and cost savings from offering a match.

***Vesting***

65. Participants are vested immediately in the value of their accounts attributable to their contributions and Employer Matching contributions. 2025 SPD at 10. Participants become vested in the value of their Employer Core Non-elective Contributions upon (a) completion of three years of service, (b) attainment of age 65, or (c) disability or death while employed at Citizens. 2025 SPD, at 10.

***Forfeitures***

66. Forfeitures in a 401(k) plan are the non-vested portion of the employer's contribution to a participant's account balance in the plan. For Citizens, if a participant is terminated from employment prior to vesting, they forfeit their Employer Core Non-Elective Contributions. 2025 SPD at 10.

67. Defendants had no restrictions on how to allocate forfeited amounts prior to January 1, 2025 when Defendants were to either use forfeitures "to reduce Employer Core Nonelective Contributions and Employer Matching Contributions, to restore previously forfeited amounts under … Section 9.2 or pay expenses of the Plan as determined by the Plan Administrator (defined as the Plan Sponsor, and includes any person or committee appointed to administer the Plan)."

2021 Plan Document, at Art. 9.2. Accordingly, the decision as to how to use Plan forfeiture accounts was unquestionably discretionary.

68. The Ninth Amendment to the Plan Document modified this aforementioned language. The amendment stated that Article 9.2 of the Plan Document shall, effective January 1, 2025, be amended to state "[a]mounts forfeited hereunder shall be used first to restore previously forfeited amounts under this Section 9.2 and next reduce Employer Core Nonelective Contributions and Employer Matching Contributions." *See* Ninth Amendment CFG Retirement Savings Plan, executed December 20, 2024 on behalf of Citizens. Further, it stated "[a]ny balance remaining immediately following a reduction of Employer contributions may be used to pay expenses of the Plan as determined by the Plan Administrator." *Id.*

## VI. THE TOTALITY OF CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A. The Challenged Funds in the Plan

69. As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

70. ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S.Ct. at 741.

71. As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of

the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

72. The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.

73. Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

74. A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

75. As relevant to this matter, Defendants selected and continued to retain the Challenged Funds despite persistent, materially weaker comparative data points over successive review periods. Defendants failed to investigate and evaluate those data points against contemporaneously available investment alternatives, including differences in investment objectives, risk, returns, costs, and other relevant characteristics, individually and interdependently. Defendants' continued retention of the Challenged Funds reflected a deficient

fiduciary selection and monitoring methodology that failed to establish a prudent investment rationale grounded solely in the financial interests of Plan participants and beneficiaries. *See* 29 C.F.R. § 2550.404a-1(b)(1)–(2).

76. With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

77. Defendants failed to account for the comparative differences in investment risk, net returns, and costs of the Challenged Funds compared to the Comparator Funds and how it affected the Plan participants' retirement money. The comparative evidence identified herein concerns the investment alternatives and financial information available at the relevant times.

78. Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

79. The Supreme Court has confirmed that fiduciaries must conduct their own independent evaluation of investments offered in a participant-directed plan, and must remove imprudent investments in a timely manner. *Hughes v. Northwestern University*, 595 U.S. 170, 176–77 (2022); *see also In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Cir. 1996) (addressing independent investigation of investments).

80. The Plan offers several funds in different asset classes, including the Challenged Funds. The first Challenged Fund is the Fidelity TDFs:

| | **Assets Under Management** | | | | |
|---|---|---|---|---|---|
| **TDF Vintage** | **2024** | **2023** | **2022** | **2021** | **2020** |
| 2020 | $48,337,000 | $55,234,000 | $52,473,000 | $69,606,000 | $71,283,000 |
| 2025 | $89,342,000 | $99,466,000 | $88,673,000 | $109,358,000 | $101,354,000 |
| 2030 | $124,520,000 | $119,270,000 | $94,552,000 | $113,099,000 | $100,000,000 |

| | | | | | |
|---|---|---|---|---|---|
| 2035 | $130,824,000 | $120,016,000 | $92,265,000 | $107,692,000 | $85,711,111 |
| 2040 | $118,990,000 | $105,120,000 | $80,465,000 | $90,845,000 | $72,621,000 |
| 2045 | $114,073,000 | $97,358,000 | $73,048,000 | $79,785,000 | $67,052,000 |
| 2050 | $89,928,000 | $74,940,000 | $53,247,000 | $59,414,000 | $49,070,000 |
| 2055 | $67,073,000 | $54,659,000 | $38,937,000 | $42,254,000 | $34,978,000 |
| 2060 | $18,016,000 | $11,667,000 | $6,403,000 | $4,093,000 | $1,835,000 |
| **Total Assets Under Management** | **$801,103,000** | **$737,730,000** | **$580,063,000** | **$676,146,000** | **$583,904,111** |

81. As demonstrated by the above, the Fidelity TDFs comprised a substantial percentage of Plan assets leading up to and throughout the Class Period. This is in part because the Fidelity TDFs were the Plan's qualified default investment alternative or QDIA. According to Plan documents, if participants "do not make an investment election, contributions to [their] account [is] automatically invested in the Fidelity Target Date Fund that corresponds closest to the year in which [they] are expected to attain age 65." 2025 SPD at 12.

82. The other Challenged Funds also comprised a significant portion of the Plan's assets as demonstrated by the below:

| | **Assets Under Management** | | | | |
|---|---|---|---|---|---|
| **Fund** | **2024** | **2023** | **2022** | **2021** | **2020** |
| Van Inst 500 Indx | $1,067,585,000 | $900,749,000 | | | |
| Van Inst Index Instl Pl | | | $704,098,000 | $851,142,000 | $681,760,000 |
| [redacted] | | | | | |
| Van Inst Tot Int'l Stck Mkt Indx | $258,359,000 | $247,894,000 | | | |
| Van Tot In't Stk Indx Fd Inst | | | $207,891,000 | $237,252,000 | $211,975,000 |
| [redacted] | | | | | |
| Van Inst Ttl Bd Mkt Indx | $105,929,000 | $90,424,000 | $74,646,000 | | |
| Van Tot Bd Mk Index | | | | $87,124,000 | $87,630,000 |
| **Total AUM** | **$1,431,873,000** | **$1,239,067,000** | **$986,635,000** | **$1,175,518,000** | **$981,365,000** |

83. During the Class Period, Defendants' failure to implement a prudent methodology in selecting and monitoring the Challenged Funds resulted in significant losses to the Plan and its participants.

84. Defendants selected and continued to retain the Challenged Funds despite persistent, materially weaker performance compared with comparable investment alternatives and relevant benchmarks over successive measurement periods. Defendants failed to investigate the consistency and economic significance of those deficiencies; independently evaluate the investments' risks, returns, objectives, and costs; and compare the Challenged Funds against contemporaneously available alternatives, individually and interdependently.

85. Throughout the Class Period, Defendants continued to retain the challenged Fidelity TDFs and Vanguard large-cap, international-equity, and fixed-income investments despite the comparative deficiencies detailed below. Defendants failed to evaluate the information available during the relevant review periods against viable contemporaneous alternatives, including differences in risk, returns, costs, investment objectives, and other material characteristics.

86. Considered individually and interdependently, the recurring comparative deficiencies and continued retention decisions support the inference that Defendants' investment-selection and monitoring methodology failed to satisfy their duties of prudence and their obligation to act solely in the financial interests of Plan participants and beneficiaries.

87. Plaintiffs do not allege Defendants were required to scour the market to find the best performing funds. Far from it. Rather, had Defendants employed a prudent methodology, they would have readily discovered in real time many funds (the "Comparator Funds") that belonged to the same asset class and Morningstar categories (explained below), but which

outperformed the Challenged Funds and were superior in several meaningful Morningstar categories. For example, the following Comparator Funds were available on the market at least five to ten years before the start of the Class Period, and could have been selected instead of the Challenged Funds, or once the Challenged Funds had been selected, they could have been replaced by the Comparator Funds:

| **Plan Fund** | **Comparator Fund** | **Ticker Symbol** | **Earliest Date Available** |
|---|---|---|---|
| Fidelity TDF | Fidelity Freedom K6 | FATKX | Prior to 2010 |
| | Trowe Ret HY T6 CIT | NA | 1-Jul-10 |
| | Am Trgt Ret R6 | RRCTX | Prior to 2010 |
| | Mutual of America | MURGX | Prior to 2010 |
| | Callan GP R11 CIT | NA | Prior to 2010 |
| | Putnam Ret Adv CIT | NA | Prior to 2010 |
| | | | |
| Van Inst.500 Indx/ Van Inst Index Instl Pl | Putnam Core EQ Y | PMYYX | 9/24/2010 |
| | Van G&I And | VGIAX | May 14, 2001 |
| | Allspring Disc US Core R6 | EVSRX | Prior to 2010 |
| | Allspring Disc US Core I | EVSIX | Prior to 2010 |
| | Fed Hermes MDT A/C Core R6 | QKACX | Prior to 2010 |
| | JPM US LC Core Plus R6 | JLPYX | Prior to 2010 |
| | | | |
| Van Inst Tot Int'l Stk Mkt Indx/ Van Tot In't Stk Indx Fd Inst | Artisan Int'l Val Inst | APHKX | Prior to 2010 |
| | State Str Hedge Int'l Dev Indx K | SSHQX | Prior to 2015 |
| | Lazard ACW Ex US Eq Adv CIT CL 0IM | NA | Prior to 2010 |
| | | | |
| Van Inst Ttl Bd Mkt Indx/ Van Tot Bd Mk Index | DH Core Bond Y | DHRYX | Prior to 2010 |
| | EV Core Bond Inst | EIGX | Prior to 2010 |
| | JPM Core Bond R6 | JCBUX | Prior to 2010 |

Defendants failed to evaluate the Challenged Funds against contemporaneously available alternatives, including the Comparator Funds, with comparable investment objectives, asset allocations, risk characteristics, historical net returns, expenses, and investment structures. The

alternatives identified herein provide evidence of material comparative disadvantages that Defendants failed to investigate and address during successive investment reviews. Defendants continued to retain the Challenged Funds without establishing, through independent qualitative and quantitative analysis of the information available at each relevant decision date, that those decisions were prudent and made solely in the financial interests of Plan participants and beneficiaries.

88. Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of imprudent funds (identified above) in the Plan throughout the Class Period that wasted the assets of the Plan and its participants.

**B. Fiduciary Investment Selection and Monitoring Methodology**

89. Defendants failed to employ an independent investment-selection and monitoring methodology that evaluated the Challenged Funds against contemporaneously available investment alternatives within comparable investment categories.

90. Defendants failed to examine three-, five-, and ten-year historical performance records, where available, together with relevant benchmarks, peer rankings, investment objectives, risk, volatility, expenses, and other material qualitative and quantitative characteristics. Their evaluations also failed to account for the distinctive risk characteristics, asset allocations, and glide paths of target-date funds. Defendants failed to consider these factors individually, collectively, and interdependently in determining whether selecting and retaining the Challenged Funds served solely the financial interests of Plan participants and beneficiaries. Defendants' continuing decision to retain the Challenged Funds were not supported by an adequate independent comparison of readily available alternative investments.

### 1. Investment Research and Comparative Evidence

91. Defendants failed to incorporate and independently evaluate available investment research, including relevant Morningstar data concerning historical returns, investment categories, holdings, costs, risk characteristics, and other material investment attributes. Their continued retention of the Challenged Funds was not supported by an adequate independent comparative evaluation establishing that their decision served the sole financial interests of Plan participants and beneficiaries.

92. Morningstar publishes investment classifications, including categories for mutual funds and target-date investments, that can assist fiduciaries in identifying potential peers for an appropriately controlled comparison.

93. Morningstar assigns investments to categories by examining the securities and strategies in their portfolios, including portfolio composition and statistics over the preceding three years. These category classifications provide a comparative peer universe, but do not determine which particular investment should be selected or retained. *See* Morningstar, 'Morningstar Category,' https://www.morningstar.com/investing-terms/morningstar-category.

94. Further, as Morningstar states, it created its categories "to help investors make meaningful comparisons between mutual funds. Morningstar found that the investment objective listed on a fund's prospectus often did not adequately explain how the fund was actually invested." Morningstar Category Classification, 31 March 2022 ("Morningstar Classifier") at page 5. The Morningstar Classifier goes on to state that "[f]or example, many funds claimed to be seeking "growth," but some of those were investing in established blue-chip companies while others were investing in small-cap companies." *Id.*

95. Defendants failed to examine investment-style and management differences as part

of their comparative screening of available investment alternatives serving comparable investment objectives. They failed to apply consistent qualitative and quantitative criteria to those alternatives.

96. Morningstar quartile ranks group funds according to relative performance within an identified peer category and measurement period. Each quartile represents approximately one-fourth of that peer group:

1. **Top Quartile**: The top 25% of funds (highest performance).
2. **Second Quartile (Q2)**: The next 25% of funds (above average performance).
3. **Third Quartile (Q3)**: The next 25% of funds (below average performance).
4. **Bottom Quartile**: The bottom 25% of funds (lowest performance).
    - **Example**: If a fund is in the **1st quartile**, it means it is among the top 25% of funds. If it is in the **4th quartile**, it is among the lowest 25% of funds in that group.
    - **Quartile Ranks** are often used over specific time periods like 1-year, 3-year, and 5-year to understand consistent performance over time.

*Available at https://community.morningstar.com/s/article/Ranks-of-Funds*

97. Morningstar percentile ranks describe investment performance relative to the other investments in the relevant peer group over a specified period. For example, a fourth-percentile ranking indicates that the investment outperformed approximately 96% of its peers. See Morningstar, 'Ranks of Funds,' https://community.morningstar.com/s/article/Ranks-of-Funds.

98. Returns simply measure the return on investment.

### 2. The Challenged Funds Were Imprudent Choices When Compared to the Relevant Benchmarks

#### (1) Defendants Breached their Fiduciary Duties By Selecting and Retaining the Fidelity TDFs

99. Target date funds are designed to provide a single diversified investment vehicle for plan participants. Target date funds are offered as a suite of funds, with each fund based on the participant's anticipated retirement date.

100. The target date refers to the participant's expected retirement year. For example, "target date 2030" funds are designed for individuals who intend to retire in 2030. As the year 2030 approaches, the fund's investment manager adjusts the underlying asset mix to become more conservative.

101. The first target date funds in the industry were offered as early as 1994, and since then the market for target date funds has exploded with numerous investment managers offering a variety of different target date fund investments.

102. By the mid-2000s, many target date funds with established performance histories were available to defined contribution plans. By 2009, several target date funds had performance histories of five years or more.

103. Multiple types of assets are included in a target date fund portfolio, including equity (stock) and fixed income (bond) securities. Target date funds offer diversity and balanced exposure to a broad array of underlying securities included in the fund.

104. An investment in a single target date fund can be attractive to plan participants who do not want to actively manage their retirement savings and periodically convert to more conservative holdings as their retirement date draws near. Often, participants invest all their retirement assets in a single target date fund that matches their retirement date.

105. Given the set-it-and-forget-it nature of target date funds, a fiduciary has a heightened duty to ensure that a prudent target date fund is offered to plan participants.

106. As noted above, target date funds automatically rebalance their portfolios to become more conservative as the participant gets closer to retirement.

107. This rebalancing occurs according to the fund's "glide path," which is designed and established by the investment manager. A glide path determines how the fund's target allocations

among underlying investments are expected to change over time, generally shifting toward more conservative allocations as the target retirement date approaches. However, investment managers employ different glide-path methodologies, reflecting their judgments about asset allocation, risk, and expected returns. Consequently, target-date funds with the same retirement year may have materially different risk-and-return characteristics, making those differences relevant when evaluating comparable investment alternatives.

108. Defendants failed to compare the challenged Fidelity TDFs by vintage against readily-available alternatives, relevant benchmarks, and the consistency of their historical results.

109. Specifically, Defendants failed to evaluate differences in investment philosophy, underlying holdings, asset allocations, glide paths, and risk profiles among target-date investments with comparable retirement vintages when selecting and retaining the challenged Fidelity TDFs.

110. Here, the performance histories of the Fidelity TDFs were mediocre when compared to their appropriate peer group. Additionally, within the target-date categories described above, several available alternatives reported stronger returns and peer rankings. Those comparisons consider investment styles and philosophies alongside other material investment characteristics, without presuming any one approach to be superior. Using 2021 as an example year, the following table compares the Fidelity TDFs and just some of the available alternatives across the corresponding target-date vintages:

| | 2021 Ret | Quart Rank/ Percentile Rank | 2021 Diff | 2021 Dam |
|---|---|---|---|---|
| Fid Free Indx TD 2020 T CIT | 8.45% | 3rd/59th | | |
| Fid Free 2020 K6 | 9.07% | 2nd/37th | 0.62% | $431,557 |
| Trowe Ret HY 2020 T6 CIT | 10.35% | 1st/12th | 1.90% | $1,322,514 |
| Am 2020 Trgt Ret R6 | 10.64% | 1st/4th | 2.19% | $1,524,371 |
| Mutual of America 2020 | 9.80% | 1st/25th | 1.35% | $939,681 |

| | | | | |
|---|---|---|---|---|
| Callan GP 2020 R11 CIT | 13.94% | 1st/1st | 5.49% | $3,821,369 |
| Putnam Ret Adv 2020 XA CIT | | | | |
| Cat: Tgt Date 2020 | 8.45% | | 0.00% | |
| Index: Morn Life Mod 2020 | 9.04% | | 0.59% | |
| | | | | |
| Fid Free Indx TD 2025 T CIT | 9.59% | 3rd/64th | | |
| Fid Free 2025 K6 | 10.29% | 2nd/37th | 0.70% | $765,506 |
| Trowe Ret HY 2025 T6 CIT | 11.85% | 1st/13th | 2.26% | $2,471,491 |
| Am 2025 Trgt Ret R6 | 11.44% | 1st/17th | 1.85% | $2,023,123 |
| Mutual of America 2025 | 11.96% | 1st/12th | 2.37% | $2,591,785 |
| Callan GP 2025 R11 CIT | 15.78% | 1st/1st | 6.19% | $6,769,260 |
| Putnam Ret Adv 2025 XA CIT | | | | |
| Cat: Tgt Date 2025 | 9.75% | | 0.16% | |
| Index: Morn Life Mod 2025 | 10.10% | | 0.51% | |
| Index: S&P Tgt 2025 | | | | |
| | | | | |
| Fid Free Indx TD 2030 T CIT | 10.97% | 3rd/75th | | |
| Fid Free 2030 K6 | 10.29% | 2nd/37th | -0.68% | -$769,073 |
| Trowe Ret HY 2030 T6 CIT | 13.64% | 1st/12th | 2.67% | $3,019,743 |
| Am 2030 Trgt Ret R6 | 13.16% | 1st/16th | 2.19% | $2,476,868 |
| Mutual of America 2030 | 15.29% | 1st/1st | 4.32% | $4,885,877 |
| Callan GP 2030 R11 CIT | 17.14% | 1st/1st | 6.17% | $6,978,208 |
| Putnam Ret Adv 2030 XA CIT | 12.26% | 2nd/37th | 1.29% | $1,458,977 |
| Cat: TD 2030 | 11.68% | | 0.71% | |
| Bench/Index: Morn LT Mod 2030 | 11.69% | | 0.72% | |
| Bench/Index: S&P Tgt 2030 | 12.61% | | 1.64% | |
| | | | | |
| Fid Free Indx TD 2035 T CIT | 13.82% | 3rd/51st | | |
| Fid Free 2035 K6 | 14.56% | 2nd/28th | 0.74% | $796,921 |
| Trowe Ret HY 2035 T6 CIT | 15.31% | 1st/15th | 1.49% | $1,604,611 |
| Am 2035 Trgt Ret R6 | 15.54% | 1st/11th | 1.72% | $1,852,302 |
| Mutual of America 2035 | 17.84% | 1st/1st | 4.02% | $4,329,218 |
| Callan GP 2035 R11 CIT | 18.21% | 1st/1st | 4.39% | $4,727,679 |
| Putnam Ret Adv 2035 XA CIT | 15.00% | N/A | 1.18% | $1,270,766 |
| Cat: TD 2035 | 13.76% | | -0.06% | |
| Bench/Index: Morn LT Mod 2035 | 13.63% | | -0.19% | |
| S&P Tgt 2035 | **14.93%** | | **1.11%** | |
| | | | | |
| Fid Free Indx TD 2040 T CIT | 15.98% | 2nd/39th | | |
| Fid Free 2040 K6 | 16.70% | 1st/17th | 0.72% | $654,084 |
| Trowe Ret HY 2040 T6 CIT | 16.76% | 1st/16th | 0.78% | $708,591 |

| | | | | |
|---|---|---|---|---|
| Am 2040 Trgt Ret R6 | 16.83% | 1st/16th | 0.85% | $772,183 |
| Mutual of America 2040 | 19.89% | 1st/1st | 3.91% | $3,552,040 |
| Callan GP 2040 R11 CIT | 19.03% | 1st/1st | 3.05% | $2,770,773 |
| Putnam Ret Adv 2040 XA CIT | 16.77% | 1st/16th | 0.79% | $717,676 |
| Cat: TD 2040 | 15.47% | | -0.51% | |
| Bench/Index: Morn LT Mod 2040 | 15.35% | | -0.63% | |
| S&P Tgt 2040 | 16.55% | | 0.57% | |
| | | | | |
| Fid Free Idx 2045 T CIT | 16.00% | 3rd/71st | | |
| Fid Free 2045 K6 | 16.78% | 2nd/49th | 0.78% | $708,591 |
| Trowe Ret HY 2045 T6 CIT | 17.65% | 1st/21st | 1.65% | $1,498,943 |
| Am 2045 Trgt Ret R6 | 17.18% | 2nd/35th | 1.18% | $1,071,971 |
| Mutual of America 2045 | 20.57% | 1st/1st | 4.57% | $4,151,617 |
| Callan GP 2045 R11 CIT | 19.23% | 1st/4th | 3.23% | $2,934,294 |
| Putnam Ret Adv 2045 XA CIT | 17.74% | 1st/20th | 1.74% | $1,580,703 |
| Cat: TD 2045 | **16.63%** | | **0.63%** | |
| Bench/Index: Morn LT Mod 2045 | **16.36%** | | **0.36%** | |
| S&P Tgt 2045 | **17.51%** | | **1.51%** | |
| | | | | |
| Fid Free Idx 2050 T CIT | 15.98% | 4th/85th | | |
| Fid Free 2050 K6 | 16.79% | 3rd/61st | 0.81% | $481,253 |
| Trowe Ret HY 2050 T6 CIT | 17.74% | 2nd/35th | 1.76% | $1,045,686 |
| Am 2050 Trgt Ret R6 | 17.27% | 2nd/43st | 1.29% | $766,441 |
| Mutual of America 2050 | 20.82% | 1st/2nd | 4.84% | $2,875,638 |
| Callan GP 2050 R11 CIT | 19.22% | 1st/7th | 3.24% | $1,925,014 |
| Putnam Ret Adv 2050 XA CIT | 18.61% | N/A | 2.63% | $1,562,588 |
| Cat: TD 2050 | **17.12%** | | **1.14%** | |
| Bench/Index: Morn LT Mod 2050 | **16.60%** | | **0.62%** | |
| S&P Tgt 2050 | **17.99%** | | **2.01%** | |
| | | | | |
| Fid Free Indx TD 2055 T CIT | 16.03% | 4th/85th | | |
| Fid Free 2055 K6 | 16.77% | 3rd/65th | 0.74% | $312,680 |
| Trowe Ret HY 2055 T6 CIT | 17.77% | 2nd/34th | 1.74% | $735,220 |
| Am 2055 Trgt Ret R6 | 17.28% | 2nd/48th | 1.25% | $528,175 |
| Mutual of America 2055 | 21.11% | 1st/1st | 5.08% | $2,146,503 |
| Callan GP 2055 R11 CIT | 19.27% | 1st/10th | 3.24% | $1,369,030 |
| Putnam Ret Adv 2055 XA CIT | 19.47% | N/A | 3.44% | $1,453,538 |
| Cat: TD 2055 | 17.30% | | 1.27% | |
| Bench/Index: Morn LT Mod 2055 | 16.50% | | 0.47% | |
| S&P Tgt 2055 | 18.19% | | 2.16% | |

| [redacted] | | | | |
|---|---|---|---|---|
| Fid Free Indx TD 2060 T CIT | 15.95% | 4th/86th | | |
| Fid Free 2060 K6 | 16.71% | 3rd/71st | 0.76% | $31,107 |
| Trowe Ret HY 2060 T6 CIT | 17.73% | 3rd/39th | 1.78% | $72,855 |
| Am 2060 Trgt Ret R6 | 17.19% | 3rd/56th | 1.24% | $50,753 |
| Mutual of America 2060 | 21.60% | 1st/1st | 5.65% | $231,255 |
| Callan GP 2060 R11 CIT | 19.23% | 1st/13th | 3.28% | $134,250 |
| Putnam Ret Adv 2060 XA CIT | 20.20% | N/A | 4.25% | $173,953 |
| Cat: TD 2060 | 17.47% | | 1.52% | |
| Bench/Index: Morn LT Mod 2060 | 16.33% | | 0.38% | |
| S&P Tgt 2060 | 18.05% | | 2.10% | |

111. Defendants failed to consider the multiyear investment-performance information available at the beginning of the Class Period when reviewing the Fidelity TDFs for continued retention.

112. The 2021 comparative data above identify target-date alternatives with materially stronger reported results in several corresponding retirement vintages, while other comparisons are less favorable. Defendants failed to investigate those differences against the multiyear investment risks, expenses, and other characteristics available at the relevant review dates.

113. Defendants failed to assess whether the weaker results recurring across particular vintages and periods were attributable to differences in investment risks, glide paths, costs, or other material characteristics and whether those differences justified continuing to retain the Fidelity TDFs solely in participants' financial interests.

114. To provide a longer historical perspective, the following table compares how often the Fidelity target-date investments and selected alternatives appeared among the stronger peer rankings or exceeded relevant benchmarks during the indicated periods. The frequency figures must be read with the underlying benchmark definitions, data coverage, and any missing histories in mind:

| Time Period 1/1/2011-12/31/2025 Rolling Window: 5 years 1 month | Top Quart Rank/ # of periods avail | Outperforms Bench/ # of periods avail |
|---|---|---|
| Fid Free Indx TD 2025 T CIT | | 83%/121 |
| Fid Free 2025 K6 | 56%/121 | 87%/121 |
| Trowe Ret HY 2025 T6 CIT | | 100%/121 |
| Am 2025 Trgt Ret R6 | 90%/121 | 98%/121 |
| Mutual of America 2025 | 74%/121 | 88%/121 |
| Callan GP 2025 R11 CIT | | 100%/121 |
| Putnam Ret Adv 2025 XA CIT | N/A | N/A |
| Fid Free Indx TD 2030 T CIT | | 79%/121 |
| Fid Free 2030 K6 | 74%/121 | 88%/121 |
| Trowe Ret HY 2030 T6 CIT | | 100%/121 |
| Am 2030 Trgt Ret R6 | 100%/121 | 100%/121 |
| Mutual of America 2030 | 83%/121 | 93%/121 |
| Callan GP 2030 R11 CIT | | 100%/121 |
| Putnam Ret Adv 2030 XA CIT | | 70%/121 |
| Fid Free Indx TD 2035 T CIT | | 82%/121 |
| Fid Free 2035 K6 | 81%/121 | 89%/121 |
| Trowe Ret HY 2035 T6 CIT | | 100%/121 |
| Am 2035 Trgt Ret R6 | 100%/121 | 100%/121 |
| Mutual of America 2035 | 83%/121 | 93%/121 |
| Callan GP 2035 R11 CIT | | 100%/121 |
| Putnam Ret Adv 2035 XA CIT | | 76%/121 |
| Fid Free Indx TD 2040 T CIT | | 79%/121 |
| Fid Free 2040 K6 | 74%/121 | 87%/121 |
| Trowe Ret HY 2040 T6 CIT | | 100%/121 |
| Am 2040 Trgt Ret R6 | 100%/121 | 100%/121 |
| Mutual of America 2040 | 76%/121 | 93%/121 |
| Callan GP 2040 R11 CIT | | 100%/121 |
| Putnam Ret Adv 2040 XA CIT | | 88%/121 |
| Fid Free Idx 2045 T CIT | | 85%/121 |
| Fid Free 2045 K6 | 68%/121 | 89%/121 |
| Trowe Ret HY 2045 T6 CIT | | 100%/121 |
| Am 2045 Trgt Ret R6 | 98%/121 | 100%/121 |
| Mutual of America 2045 | 74%/121 | 92%/121 |
| Callan GP 2045 R11 CIT | | 100%/121 |
| Putnam Ret Adv 2045 XA CIT | | 92%/121 |

| | | |
|---|---|---|
| Fid Free Idx 2050 T CIT | | 83%/121 |
| Fid Free 2050 K6 | 64%/121 | 93%/121 |
| Trowe Ret HY 2050 T6 CIT | | 100%/121 |
| Am 2050 Trgt Ret R6 | 92%/121 | 100%/121 |
| Mutual of America 2050 | 63%/99 | 90%/99 |
| Callan GP 2050 R11 CIT | | 100%/121 |
| Putnam Ret Adv 2050 XA CIT | | 94%/121 |

| | | |
|---|---|---|
| Fid Free Indx TD 2055 T CIT | | 92%/115 |
| Fid Free 2055 K6 | 70%/115 | 100%/115 |
| Trowe Ret HY 2055 T6 CIT | | 100%/121 |
| Am 2055 Trgt Ret R6 | 91%/121 | 99%/121 |
| Mutual of America 2055 | 84%/51 | 100%/51 |
| Callan GP 2055 R11 CIT | | 100%/121 |
| Putnam Ret Adv 2055 XA CIT | | 98%/121 |

| | | |
|---|---|---|
| Fid Free Indx TD 2060 T CIT | | 91%/70 |
| Fid Free 2060 K6 | 74%/77 | 100%/77 |
| Trowe Ret HY 2060 T6 CIT | | 100%/72 |
| Am 2060 Trgt Ret R6 | 91%/121 | 99%/121 |
| Callan GP 2060 R11 CIT | | 100%/92 |
| Putnam Ret Adv 2060 XA CIT | | 100%/59 |

115. Additionally, the following historical comparison summarizes returns available before the start of the Class Period. Where the histories differ in length, an informed fiduciary must account for those differences rather than assume universal outperformance:

| **2020 Lookbacks** | **10 Year** |
|---|---|
| Fid Free Indx TD 2020 T CIT | 7.50% |
| Fid Free 2020 K6 | 7.61% |
| Trowe Ret HY 2020 T6 CIT | 8.75% |
| Am 2020 Trgt Ret R6 | 8.14% |
| Mutual of America 2020 | 7.99% |
| Callan GP 2020 R11 CIT | 9.01% |
| Putnam Ret Adv 2020 XA CIT | N/A |
| [redacted] | |
| Fid Free Indx TD 2025 T CIT | 8.20% |
| Fid Free 2025 K6 | 8.23% |

| | |
|---|---|
| Trowe Ret HY 2025 T6 CIT | 9.40% |
| Am 2025 Trgt Ret R6 | 9.25% |
| Mutual of America 2025 | 8.87% |
| Callan GP 2025 R11 CIT | 9.49% |
| Putnam Ret Adv 2025 XA CIT | -8.03% |
| | |
| Fid Free Indx TD 2030 T CIT | 8.86% |
| Fid Free 2030 K6 | 8.88% |
| Trowe Ret HY 2030 T6 CIT | 9.96% |
| Am 2030 Trgt Ret R6 | 10.08% |
| Mutual of America 2030 | 9.57% |
| Callan GP 2030 R11 CIT | 9.91% |
| Putnam Ret Adv 2030 XA CIT | 8.93% |
| | |
| Fid Free Indx TD 2035 T CIT | 9.61% |
| Fid Free 2035 K6 | -9.52% |
| Trowe Ret HY 2035 T6 CIT | 10.39% |
| Am 2035 Trgt Ret R6 | 10.77% |
| Mutual of America 2035 | NA |
| Callan GP 2035 R11 CIT | 10.14% |
| Putnam Ret Adv 2035 XA CIT | 9.63% |
| | |
| Fid Free Indx TD 2040 T CIT | 9.80% |
| Fid Free 2040 K6 | 9.69% |
| Trowe Ret HY 2040 T6 CIT | 10.71% |
| Am 2040 Trgt Ret R6 | 11.09% |
| Mutual of America 2040 | 10.11% |
| Callan GP 2040 R11 CIT | 10.25% |
| Putnam Ret Adv 2040 XA CIT | 10.09% |
| | |
| Fid Free Idx 2045 T CIT | 9.84% |
| Fid Free 2045 K6 | 9.73% |
| Trowe Ret HY 2045 T6 CIT | 10.82% |
| Am 2045 Trgt Ret R6 | 11.21% |
| Mutual of America 2045 | 10.07% |
| Callan GP 2045 R11 CIT | 10.33% |
| Putnam Ret Adv 2045 XA CIT | 10.46% |
| | |
| Fid Free Idx 2050 T CIT | 9.85% |
| Fid Free 2050 K6 | 9.72% |
| Trowe Ret HY 2050 T6 CIT | 10.82% |
| Am 2050 Trgt Ret R6 | 11.29% |
| Mutual of America 2050 | N/A |

| | | |
|---|---|---|
| Callan GP 2050 R11 CIT | | 10.34% |
| Putnam Ret Adv 2050 XA CIT | | 10.77% |
| | | |
| Fid Free Indx TD 2055 T CIT | N/A | |
| Fid Free 2055 K6 (FCTKX) | N/A | |
| Trowe Ret HY 2055 T6 CIT | | 10.80% |
| Am 2055 Trgt Ret R6 | | 11.27% |
| Mutual of America 2055 | N/A | |
| Callan GP 2055 R11 CIT | | 10.34% |
| Putnam Ret Adv 2055 XA CIT | | 10.98% |
| | | |
| Fid Free Indx TD 2060 T CIT | N/A | |
| Fid Free 2060 K6 | N/A | |
| Trowe Ret HY 2060 T6 CIT | N/A | |
| Am 2060 Trgt Ret R6 | N/A | |
| Mutual of America 2060 | N/A | |
| Callan GP 2060 R11 CIT | N/A | |
| Putnam Ret Adv 2060 XA CIT | N/A | |

116. The Fidelity TDFs also consistently underperformed the S&P Target Date benchmark from 2012 to 2022 (*See* the Plan's Notice of Investment Returns & Fee Comparison (showing the Fidelity TDFs to have underperformed their benchmark for the majority of vintages in the ten years preceding 2022).

117. Defendants' retention of the challenged target-date investments exposed participants, including those approaching retirement, to comparative differences in accumulated retirement capital and risk of loss near the years when they would begin withdrawals. The damages tables below present the alleged economic consequences of these decisions under the identified alternative investment scenarios.

118. The following table presents the estimated investment losses associated with retaining the Fidelity TDFs from 2021 through 2024, measured against the identified alternative investments. These comparisons illustrate the economic consequences of the challenged fiduciary

decisions and the investment returns that Plan participants could have earned through alternative selections:

| | 2024 | 2023 | 2022 | 2021 | Total |
|---|---|---|---|---|---|
| Fid Free K6 | $601,424 | $5,248,161 | $319,593 | $3,412,626 | $9,581,804 |
| Trowe Ret HY T6 CIT | $9,195,789 | $9,631,226 | $8,165,989 | $12,479,654 | $39,472,658 |
| Am Trgt Ret R6 | $9,687,268 | -$2,908,376 | $8,872,251 | $11,066,187 | $26,717,330 |
| Mutual of America | $9,604,620 | -$1,796,626 | $15,439,966 | $25,703,614 | $48,951,574 |
| Callan GP R11 CIT | $6,814,464 | -$10,778,257 | $18,885,879 | $31,429,877 | $46,351,963 |
| Putnam Ret Adv | $32,615,760 | $7,789,574 | $9,492,767 | $8,218,201 | $58,116,302 |

119. The alleged investment losses from selecting and retaining the Fidelity TDFs are measured against the specified alternative scenarios; any additional losses after 2024 depend upon the investments' continued retention and verified subsequent performance.

120. Defendants failed to establish through their investment-selection and monitoring methodology that these decisions were prudent and served solely the financial interests of Plan participants and beneficiaries.

121. Failure to consider the Fidelity Freedom K6 target-date series illustrates one example of Defendants' lack of a prudent methodology. Certain corresponding vintages and periods reported stronger outcomes for the K6, yet Defendants failed to examine differences in risk, costs, structure, availability, and the financial consequences to participants when failing to replace the Fidelity TDFs.

122. Moreover, Defendants failed to investigate recurring comparative differences in returns and peer rankings across target-date years and historical periods. Their retention decisions did not reflect an assessment of which materially stronger alternatives were genuinely comparable and available at the time, given the relevant risks, allocations, and expenses.

**(2) Defendants Breached their Fiduciary Duties By Selecting and Retaining the Vanguard Institutional 500 Index Investments**

123. Defendants selected and failed to remove the materially underperforming Vanguard Inst. 500 Index/ Van Inst Index Instl Pl funds.

Defendants failed to assess these large-cap investments against genuinely comparable, contemporaneously available alternatives, including historical net returns, risk, costs, and peer benchmarks available during each review period.

124. The below chart examines the Vanguard Inst. 500 Index/ Van Inst Index Instl Pl funds, comparing their Morningstar data with comparable funds using 2021 as an example year:

| | 2021 1Yr Ret | 2021 Quart Rank/ Perc Rank | 2021 Diff | 2021 Dam |
|---|---|---|---|---|
| Van Inst 500 Indx Tr CIT | 28.70% | 1st/22nd | | |
| Vanguard Inst Index Instl Pl | 28.69% | 1st/23rd | | |
| Van G&I Adm | 29.11% | 1st/18th | 0.42% | $3,574,796 |
| Putnam Core EQ Y | 30.75% | 1st/9th | 2.06% | $17,533,525 |
| All Disc US Core R6 | 31.01% | 1st/8th | 2.32% | $19,746,494 |
| All Disc US Core I | 30.94% | 1st/9th | 2.25% | $19,150,695 |
| Fed Hermes MDT A/C Core R6 | 31.25% | 1st/8th | 2.56% | $21,789,235 |
| JPM US LC Core Plus R6 | 29.41% | 1st/15th | 0.72% | $6,128,222 |

125. The 2021 large-cap comparison identifies investments with stronger reported returns or rankings than the challenged investment. Defendants failed to evaluate those results together with the three-, five-, and ten-year histories, investment objectives, risks, net expenses, and structural differences available at the relevant time.

126. For the large-cap investments, the following table summarizes Plaintiffs' alternative-return scenarios from 2021 through 2024:

| | 2024 | 2023 | 2022 | 2021 | Total |
|---|---|---|---|---|---|
| Van G&I Adm | **$13,665,088** | -$13,691,385 | **$7,181,800** | **$3,574,796** | **$10,730,299** |
| Putnam Core EQ Y | **$15,693,500** | **$15,402,808** | **$15,912,615** | **$17,533,525** | **$64,542,448** |
| All Disc US Core R6 | **$51,031,563** | **$1,351,124** | **$2,534,753** | **$19,746,494** | **$74,663,934** |

| | | | | | |
|---|---|---|---|---|---|
| All Disc US Core I | **$50,390,012** | **$450,375** | **$2,182,704** | **$19,150,695** | **$72,173,786** |
| Fed Hermes MDT A/C Core R6 | **$64,695,651** | -$24,680,523 | **$28,797,608** | **$21,789,235** | **$90,601,971** |
| JPM US LC Core Plus R6 | **$43,023,676** | **$32,066,664** | -$1,830,655 | **$6,128,222** | **$79,387,907** |

127. Based on the above, damages ranged from $10.7 million plus to $91 million as of 2024, before interest, if the readily available alternatives had been selected. The above comparators are just a few examples of the many available funds within the same peer group as the Vanguard Inst. 500 index funds and Van Inst Index Instl Pl funds that outperformed the Vanguard Inst. 500 index funds. These damages have continued to accrue since 2024 to the extent the Vanguard Inst. 500 index funds remain in the Plan.

**(3) Defendants Breached their Fiduciary Duties by Selecting and Retaining the Van Inst To Int'l Stk Mkt Index Tr**

128. Defendants selected and failed to remove the materially underperforming Van Inst To Int'l Stk Mkt Index Tr CIT and Van Tot In't Stk Indx Fd Inst funds.

129. Defendants failed to evaluate the challenged international-equity investments against contemporaneously available and genuinely comparable alternatives, including differences in regional exposure, currency risk, diversification, expenses, and historical performance.

130. The below chart examines these funds, comparing their Morningstar data with comparable funds using 2021 as an example year.

| | 2021 1Yr Ret | 2021 Quart Rank/ Perc Rank | 2021 Diff | 2021 Dam |
|---|---|---|---|---|
| Van Inst Tot Int'l STk Mkt Indx Tr CIT | 8.73% | 3rd/67th | 0.05% | |
| Van Total In'l Stk Indx Fd Inst Plus | 8.68% | 3rd/68th | | |
| Artisan Int'l Val Inst | 16.97% | 1st/4th | 8.29% | $19,668,191 |
| State Str Hedge Int'l Dev Indx K | 19.31% | 1st/2nd | 10.63% | $25,219,888 |
| Lazard ACW Ex US Eq Adv CIT CL 0IM | 13.16% | 1st/16th | 4.48% | $10,628,890 |

131. The 2021 international-equity comparisons identify investments with stronger reported results than the challenged funds. Defendants failed to examine the historical records and differences in geographic, currency, and market exposures relevant to retaining the challenged investments during the Class Period.

132. The following table compares the investment results of the challenged international-equity investments with identified alternatives from 2021 through 2024:

| | 2024 | 2023 | 2022 | 2021 | Total |
|---|---|---|---|---|---|
| Artisan Int'l Val Inst | $3,539,518 | $18,071,473 | $19,063,605 | $19,668,191 | **$60,342,787** |
| State Str Hedge Int'l Dev Indx K | $21,753,828 | $10,089,286 | $23,263,003 | $25,219,888 | **$80,326,005** |
| Lazard ACW Ex US Eq Adv CIT | $19,351,089 | $15,394,217 | $5,675,424 | $10,628,890 | **$51,049,620** |

133. Based on the above, damages for the Van Inst To Int'l Stk Mkt Index Tr CIT and Van Tot In't Stk Indx Fd Inst ranged from $51 million to $60 million before interest, if the readily available alternatives had been selected. The above comparators are just a few examples of the many available funds within the same peer group as the Van Inst To Int'l Stk Mkt Index Tr CIT and Van Tot In't Stk Indx Fd Inst funds that outperformed the Plan's funds. These damages have continued to accrue since 2024 to the extent the Van Inst To Int'l Stk Mkt Index Tr CIT funds remain in the Plan.

**(4) Defendants Breached their Fiduciary Duties By Selecting and Retaining the Vanguard Inst Ttl Bd Mkt Indx CIT**

134. Defendants selected and failed to remove the materially underperforming Van Inst Ttl Bd Mkt Indx and Van Tot Bd Mk Index funds. Defendants failed to examine the challenged fixed-income investments against available, appropriately comparable alternatives, including risk

of loss, credit quality, interest-rate sensitivity, expenses, and historical net returns available at each relevant review date.

135. The below chart examines these funds using 2021 as an example year.

| | 2021 Ret | Quart Rank/ % Rank | 2021 Ret Diff | 2021 Dam |
|---|---|---|---|---|
| Van Inst Ttl Bd Mkt Indx CIT | **-1.63%** | **2nd/47th** | **0.02%** | **$17,425** |
| Van Tot Bond Mkt Index I | -1.65% | 2nd/50th | | |
| DH Core Bond Y | **-0.95%** | **1st/19th** | **0.70%** | **$609,868** |
| EV Core Bond Inst | **0.70%** | **1st/11th** | **2.35%** | **$2,047,414** |
| JPM Core Bond R6 | **-0.95%** | **1st/19th** | **0.70%** | **$609,868** |

136. The 2021 fixed-income comparisons identify alternatives with stronger reported data points. Defendants failed to examine these results against multiyear evidence, interest-rate sensitivity, credit risk, fees, and the Plan's needs when continuing to retain the challenged bond investments.

137. The following table compares the investment results of the challenged bond investments with identified alternatives from 2021 through 2024:

| | 2024 | 2023 | 2022 | 2021 | Total |
|---|---|---|---|---|---|
| DH Core Bond Y | $2,372,810 | $786,689 | $1,134,619 | $609,868 | $4,903,986 |
| EV Core Bond Inst | $1,705,457 | $298,399 | $14,929 | $2,047,414 | $4,066,199 |
| JPM Core Bond R6 | $1,016,918 | $90,424 | $724,066 | $609,868 | $2,441,276 |

138. Based on the above, damages ranged from $2.4 million to at least $4.9 million, before interest, if the readily available alternatives had been selected. The above comparators are just a few examples of the many available funds within the same peer group as the Vanguard Inst Ttl Bd Mkt Indx CIT and Van Tot Bd Mk Index funds that outperformed the Plan's funds. These damages have continued to accrue since 2024 to the extent the Vanguard Inst Ttl Bd Mkt Indx CIT and Van Tot Bd Mk Index funds remain in the Plan.

### 3. There is Additional Evidence of an Imprudent Investment-Selection and Monitoring Methodology: Failure to Evaluate Risk and Reward

139. Defendants failed to evaluate the Challenged Funds using independent investment expertise and comparisons of contemporaneously available alternatives. Defendants continued to retain those investments without an investigation of their relative risks, returns, costs, and other financial characteristics or a defensible basis demonstrating that the retention decisions served solely the financial interests of Plan participants and beneficiaries. *See* 29 U.S.C. § 1104(a)(1)(A)–(B).

140. Defendants failed to make independent use of available Morningstar investment research when selecting and monitoring the challenged investments. Morningstar's star ratings, category-relative risk and return classifications, category averages, and benchmarks are historical research measures rather than purchase recommendations or legal determinations of fiduciary prudence.[9] Defendants failed to evaluate the information supplied by those measures together with contemporaneously available comparative financial evidence.

141. Defendants failed to examine the separate Morningstar Risk and Return classifications, their relationship, and the broader investment evidence individually and interdependently when comparing and monitoring the challenged investments. A risk classification of 2 identifies below-average category-relative historical risk, while a return

[9] *See Morningstar, Morningstar Rating. Defines the three-, five-, and ten-year star ratings, overall ratings, and their use as quantitative research measures rather than investment recommendations.* *https://admainnew.morningstar.com/directhelp/Glossary/Risk_and_Rating/Morningstar_Rating.htm.*

classification of 4 identifies above-average category-relative historical return; these classifications remain distinct from Morningstar's overall risk-adjusted star rating.[10]

142. The independent Morningstar comparisons contained in Appendix A (Target-Date Investments, as of February 28, 2025), Appendix B (Large Blend Investments, as of February 28, 2026), Appendix C (Foreign Large Blend Investments, as of February 28, 2026), and Appendix D (Intermediate Core Bond Investments, as of February 28, 2026) identify category-relative risk, return, and rating characteristics relevant to the Challenged Funds and the identified alternatives. The "as of dates" describe the research measurements, not the dates of Defendants' investment decisions. Defendants' selection and retention failures are alleged with respect to the contemporaneous evidence available during the Class Period.

143. Defendants failed to investigate and evaluate the risk, return, investment objectives, costs, and other material characteristics of available alternative investments before selecting and continuing to retain the challenged investments. The recurring comparative deficiencies, considered individually and interdependently, support the inference that Defendants' methodology failed to produce prudent decisions grounded solely in the financial interests of Plan participants and beneficiaries. The Plan and its participants thereby incurred the losses from retaining the Challenged Funds.

144. Appendix A provides one representative illustration of the broader comparisons pleaded in Paragraph 87, rather than an isolated winner: in the 2035 target-date vintage, the

---

[10] *See* Morningstar, Mutual Funds: Data Definitions: Ratings and Risk. Separately defines Morningstar Risk and Morningstar Return, their category-relative classifications, measurement periods, and the direction of their respective scales. https://admainnew.morningstar.com/WebHelp/glossary_definitions/quicktakes/MFRatingsandRisk.htmDefendants failed to evaluate these comparisons alongside investment objectives, volatility, downside risk, costs, asset allocation, investment horizons, and feasible contemporaneous alternatives.

challenged Fidelity Freedom Index CIT had three-, five-, and ten-year Morningstar Risk/Return classifications (as of February 28, 2025) of 3/4, 3/3, and 4/5. For those same horizons, the six pleaded comparator families reported: Fidelity Freedom K6, 4/5, 4/5, 5/5; T. Rowe Price Retirement HY T6 CIT, 4/5, 4/5, 4/5; American Funds Target Retirement R6, 2/4, 2/5, 2/5; Mutual of America, 3/3, 3/5, 4/4; Callan GP R11 CIT, 3/4, 3/5, 3/5; and Putnam Retirement Advantage CIT, 2/5, 1/5, 1/4. The paired values are separate category-relative classifications, not percentages: lower Risk reflects less downside-sensitive risk, while higher Return reflects stronger relative return; both must be examined together over all three periods.

145. The comparison presents the central fiduciary-methodology question: why did the Committee select and retain the Fidelity TDFs without the comparative investigation Plaintiffs allege was missing? American Funds showed lower classified risk and equal or higher return at each horizon; Callan equaled or improved the Fidelity TDF's return without higher risk across the same periods. Putnam improved both classifications at three and five years but involved a ten-year return trade-off; Fidelity K6 and T. Rowe Price showed stronger shorter-horizon returns with higher risk; and Mutual of America displayed mixed return results at similar risk. Those differences call for an independent, contemporaneous examination of investment objectives, glide paths, asset allocation, net costs, investment structure, and actual availability—not an automatic selection based on a single performance figure. As one sample of the many pleaded comparisons, the recurring alternatives with materially different risk/reward combinations support the plausibility of a deficient fiduciary selection-and-monitoring methodology.

****

146. The foregoing allegations concern Defendants' investment-selection and monitoring failures. Defendants' related decisions regarding recordkeeping and administrative

charges, indirect service-provider compensation, and forfeited Plan assets further demonstrate failures to evaluate the Plan's financial arrangements solely in participants' interests, as alleged below.

### C. Defendants Breached their Fiduciary Duties and Committed a Prohibited Transaction in Causing the Plan and Participants to Incur Excessive Recordkeeping and Administrative Fees Compared to the Plan's Peers

147. Another indication that the Plan was poorly managed is its excessive RKA costs per participant.

148. During the Class Period, Defendants entered into a contract with Great-West/Empower to provide RKA and trustee services to the Plan. However, such an engagement is a prohibited transaction under ERISA.

149. 29 U.S.C. §§ 1106(a)(1)(C) provides that "(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect … (C) furnishing of goods, services, or facilities between the plan and a party in interest."

150. Here, Great-West/Empower was a party in interest to the Plan as it was receiving compensation for RKA and trustee services, as well as indirect compensation from the Plan in the form of revenue share being paid to Great-West/Empower from Great-West/Empower funds in the Plan.

151. Additionally, because the RKA fees were excessive, Defendants failed their fiduciary duty to minimize unnecessary costs to the Plan and its participants.

#### 1. Costs for Recordkeeping Services Vary Little Between Competing Providers for a Plan with a Substantial Number of Participants

152. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

153. There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A. Basic account recordkeeping (e.g. demographic, source, investment and vesting records);

B. Multi-channel participant and plan sponsor access (e.g. phone, web);

C. Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

D. Payroll service (e.g. hardships, in-service withdrawals, termination distributions);

E. Participant tax reporting services (e.g., IRS Form 1099-R);

F. Participant confirmations, statements, and standard notices;

G. Plan-level reporting and annual financial package (excluding IRS Form 5500);

H. Participant education (e.g. newsletters, web articles, standard communication materials);

I. Plan consulting (e.g., preapproved document services, operational materials);

J. Plan consulting (e.g. preapproved document services, operational compliance support).

154. This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. As explained in more detail below, the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

155. The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte services typically include, but are not limited to, the following:

a. Loan processing;

b. Brokerage services/account maintenance (if offered by the plan);

c. Distribution services; and

d. Processing of qualified domestic relations orders.

156. All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services,

self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

157. The cost of providing recordkeeping services depends in large part on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. *See* 1998 DOL Study, at 4.2.2. ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases."). When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increases, the average cost per participant decreases. ***Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.***

158. In general, the level, number and character of participant services provided by the recordkeeper have minimal impact upon the costs of providing recordkeeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper ***notwithstanding the level, number and character of the services provided to that additional participant.***

159. Recordkeepers for large 401(k) plans such as Fidelity, Vanguard, Prudential, Voya, and Empower among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services).

160. Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

**2. The Plan's Recordkeeping Fees were Excessive**

161. As demonstrated in the charts below, the Plan's participants were saddled with above-market administrative and recordkeeping fees since before the start of the Class Period and throughout the Class Period.

| Plan Year | Plan Participants | Minimum Per Participant Charge | | Total RKA Reported | PP $$ based on Tot RKA |
|---|---|---|---|---|---|
| 2018 | 21,534 | $51 | | $3,006,000 | $139.59 |
| 2019 | 22,582 | $51 | | $3,250,000 | $143.92 |
| 2020 | 22,702 | $51 | | $2,264,000 | $99.73 |
| 2021 | 22,683 | $40 | | $2,193,000 | $96.68 |
| 2022 | 24,296 | $40 | | $1,745,056 | $84.54 |
| 2023 | 24,530 | $40 | | $1,793,643 | $86.95 |
| 2024 | 23,881 | $40[11] | | $1,217,887 | $74.24 |

162. The Plan's recordkeeping and administrative charges were paid by participants through deductions from their retirement accounts. The reported RKA amounts include payments to Empower Financial Services, Deloitte Touche, Willis Towers Watson, and Mercer Investments Consulting for services provided to the Plan.

163. Defendants caused participants to bear recordkeeping and administrative charges that reduced the assets remaining in their individual accounts for investment and future compounding. Defendants failed to investigate the reasonableness of the total direct and indirect compensation paid for Plan services, the services obtained, and available alternative arrangements before maintaining those charges.

[11] At some point in 2024, the per participant minimum charge for RKA may have been reduced to $9 per quarter from $10 per quarter. Even at $36 per year, this RKA rate was excessive.

164. Defendants failed to examine all compensation received by Great-West/Empower, including the additional income alleged from Plan investment funds and compensation for financial or other services, before determining the recordkeeping and administrative charges borne by participants. The Committee was obligated under Article 17.5 of the 2021 Plan Document to "determine any facts necessary for it to carry out its duties" under that document.

165. Defendants caused participants to bear recordkeeping and administrative charges that exceeded the lower per-participant charges available to comparable large plans, including the alternatives identified in the peer table below. Defendants failed to obtain the benefits of the Plan's scale and bargaining leverage when negotiating and monitoring compensation paid for Plan services. The Department of Labor's cited study describes the reduction in per-participant administrative costs associated with larger plan size.

166. Large-plan fee comparisons can account for differences in Plan assets and participant counts. The BrightScope/Investment Company Institute study cited below identifies size categories that permit comparisons with similarly scaled plans (*See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2019 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.):

167. The Plan exceeded $1 billion in assets during the Class Period and was therefore within the largest asset-size category reflected in the cited BrightScope/Investment Company Institute study.

168. The recordkeeping comparisons below show that Plan participants bore higher per-participant charges than the participants in several plans with substantial assets and participant populations during the Class Period. The table also reports the service codes attributed to the

comparator plans and the Citizens Plan, permitting assessment of the services included in the comparisons.

| Recordkeeper | Plan Name | Plan Year | Assets Under Management | Participants | Schedule C Codes | Indirect Compensation | Cost Per Participant[12] |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2020 | $938,281,291 | 9,832 | 37 60 64 65 71 | Yes - $0 | $19 |
| Vanguard | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 2020 | $1,051,387,744 | 19,354 | 15 16 21 25 26 37 50 52 57 | Yes - $0 | $23 |
| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2020 | $493,950,650 | 7,597 | 37 60 64 65 | Yes - $0 | $28 |
| Fidelity | PG&E Corporation Retirement Savings Plan | 2020 | $3,781,395,000 | 12,273 | 37 64 65 71 | No | $29 |
| **Great-West/Empower** | **Citizens Plan** | **2020** | **$2,512,186,369** | **22,702** | **15 37 50 64** | **No** | **$40** |
| | | | | | | | |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2021 | $1,341,037,601 | 10,170 | 37 60 64 65 71 | Yes - $0 | $28 |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2021 | $1,706,447,554 | 15,788 | 37, 60, 64, 65, 71 | Yes - $0 | $26 |
| **Great-West/Empower** | **Citizens Plan** | **2021** | **$2,816,476,065** | **22,683** | **15 37 50 64** | **Yes - No** | **$40** |
| | | | | | | | |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2022 | $1,475,238,032 | 16,973 | 37, 60, 64, 65, 71 | Yes - $0 | $29 |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2022 | $1,099,817,927 | 11,787 | 37 60 64 65 71 | Yes - $0 | $30 |
| **Great-West/Empower** | **Citizens Plan** | **2022** | **$2,504,448,168** | **24,296** | **15 37 50 64** | **No** | **$40** |

[12] Unless otherwise noted, these fees are taken from the Form 5500.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | |
| Prudential | Philips North America 401(k) Plan | 2023 | $5,779,286,156 | 29,489 | 15 37 50 65 99 | Yes - $0 | $27 |
| T. Rowe Price | Sanofi U.S. Group Savings Plan | 2023 | $7,800,386,450 | 26,698 | 15 37 49 | Yes - $0 | $27 |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2023 | $1,837,546,518 | 18,163 | 37, 60, 64, 65, 71 | Yes - $0 | $32 |
| Fidelity | Fortive Retirement Savings Plan | 2023 | $1,915,519,824 | 13,503 | 37, 64, 65, 71 | Yes - $0 | $30 |
| **Great-West/Empower** | **Citizens Plan** | **2023** | **$2,903,308,000** | **24,530** | **15 37 50 64** | **No** | **$40** |
| [redacted] | | | | | | | |
| Fidelity | Fortive Retirement Savings Plan | **2024** | $2,138,117,923 | 13,189 | 37, 64, 65, 71 | Yes - $0 | $29 |
| T.Rowe Price | Sanofi U.S. Group Savings Plan | **2024** | $8,494,721,918 | 26,012 | 15, 37, 49 | Yes - $0 | $23 |
| Empower | Philips North America 401(k) Plan | **2024** | $6,366,834,511 | 27,227 | 50, 64 | Yes - $0 | $20 |
| **Great-West/Empower** | **Citizens Plan** | **2024** | **$3,221,344,000** | **23,881** | **15 37 50 64** | **No** | **$40** |

169. The above chart demonstrates that for similar plans, regarding assets and participants, leading up to the start of the Class Period and throughout the Class Period, the Plan had some of the highest recordkeeping fees among its peers.

170. As of the end of 2021, the cited BrightScope/Investment Company Institute report identified 1,011 401(k) plans exceeding $1 billion in assets. *See* https://www.ici.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf. The fifteen comparator plan-year observations in the table above have a mean reported charge of approximately $26.67 per participant; Citizens' reported $40 charge was nearly 50% greater than that mean.

171. This vast discrepancy between the Plan's RKA fees and many comparable plans existed for all years throughout the Class Period. Indeed, the figures in the above chart are just an example of the Plan's excessive RKA fees during the Class Period.

172. Given the Plan's size and the lower fees reported by comparable plans, Defendants failed to secure materially lower participant recordkeeping and administrative fees that were available through competing service-provider arrangements.

173. Great-West/Empower received income from Plan investment funds in addition to compensation for recordkeeping and other services. Defendants failed to account for that additional compensation when evaluating the total provider compensation and determining how much participants paid in recordkeeping and administrative charges.

174. In sum, Defendants failed to use the Plan's substantial assets, participant size, and purchasing leverage to obtain comparable or superior RKA services at materially lower participant cost, despite the lower-cost comparator arrangements identified above.

### D. Citizens Improperly Reduced Company Matching Contributions Through the Use of Forfeitures

175. Another aspect of Defendants' mismanagement and imprudent conduct concerns Defendants' handling of the Plan's forfeiture assets.

176. From at least the start of the Class Period up until the end of 2024, Defendants breached their ERISA fiduciary duties by misusing the Plan's assets for Citizens' benefit and to the detriment of Plan participants.

177. As alleged above, Defendants had a choice on how to utilize forfeited amounts. At the discretion of Defendants, forfeitures may be used to either pay the Plan's expenses or reduce the Company's contributions to the Plan.

178. Defendants used forfeited Plan assets to reduce Citizens' employer contribution obligations, thereby conserving Citizens' own funds, while participants continued paying the Plan's RKA fees. Leading up to the start of the Class Period and through 2024, the reported

forfeiture allocations consistently benefited Citizens' contribution obligations rather than offsetting the administrative charges borne by participants.

179. Absent any risk that Citizens would be unable to satisfy its contribution obligations, using forfeitures to pay Plan expenses would be in the participants' best interests because that option would reduce or eliminate amounts otherwise charged to their accounts to cover such expenses.

180. In deciding between using forfeitures to benefit Citizens or using forfeitures to benefit the participants, the Company is presented with a conflict of interest in administering the Plan and managing and disposing of the Plan's assets.

181. When Defendants exercised discretion over forfeiture allocations, they were obligated to act solely in the interests of Plan participants and beneficiaries, including evaluating how their allocation decisions affected participants' assets and the Plan's payment of expenses. Defendants continued to charge Plan participants RKA fees that were excessive when evaluated against the available lower-cost comparator arrangements, while allocating no forfeitures to offset those expenses.

182. Instead, in every year up to 2024, Defendants used forfeitures to reduce Citizens' employer contribution obligations while allocating none of those forfeitures to offset RKA fees paid by Plan participants.

183. Considered individually and in the aggregate with their other fiduciary decisions, this unbroken pattern supports the inference that Defendants favored the employer's financial interests over those of participants and beneficiaries. The Plan's contractual permission to use forfeitures for employer contributions did not displace ERISA's fiduciary duties. *See* 29 U.S.C. § 1104(a)(1)(A), (B), (D).

184. Despite the conflict of interest presented by their decision, the Company failed to undertake any investigation into which option was in the sole interest of the Plan's participants and beneficiaries.

185. Even though the Plan document specifically required the Committee to "determine any facts necessary for it to carry out its duties [under the Plan]," *see* 2021 Plan Document, Art. 17.5, the Committee did not, for example, investigate whether there was a risk that Citizens would be unable to satisfy its contribution obligations if forfeitures were used to pay Plan expenses, or evaluate whether there were sufficient forfeitures to eliminate the Plan's expenses charged to participants and still offset a portion of Citizens' own contribution obligations, as a prudent person would have done.

186. Indeed, based on many indicia, Citizens' financial condition is stable and strong. DBRS, Inc. (Morningstar DBRS) states "Citizen's credit ratings and Stable trend reflect its strong and well-established franchise in the attractive New England, Mid-Atlantic, and Midwest regions that was augmented by the 2022 acquisitions of both Investors Bancorp (Investors) and the East Coast branches of HSBC Bank USA, N.A. (HSBC). In addition, the credit ratings also consider Citizens' asset quality metrics, which – although continuing to normalize – remain at manageable levels." *See* *https://dbrs.morningstar.com/research/457007/morningstar-dbrs-confirms-citizens-financial-group-incs-long-term-issuer-rating-at-a-low-stable-trend*

187. Defendants also failed to consult with an independent, non-conflicted decisionmaker to advise them in deciding upon the best course of action for allocating the forfeitures in the Plan, as a prudent person would have done.

188. Although ERISA, and the Plan, requires the fiduciaries to manage the Plan's assets solely in the best interest of participants, and although the Plan grants Defendants discretion to use

forfeitures to pay Plan expenses, thereby reducing or eliminating the amounts charged to participant accounts to cover such expenses, Defendants consistently declined to use the Plan's assets for such purpose during the putative Class Period.

189. Since at least the beginning of the Class Period, Defendants have improperly used forfeited non-vested Plan assets for Citizens' benefit to reduce future employer contributions instead of using the funds to benefit Plan participants.

190. According to information from the Plan's Form 5500s, the following represents the amount of the forfeitures improperly used to offset Citizens' contributions to the Plan (leading up to the start of the Class Period and throughout), and the amounts used to pay for Plan administration expenses:

| Plan Year | Forfeitures used to reduce employer matching contributions | Forfeitures used to pay Plan expenses | Balance in forfeiture account |
|---|---|---|---|
| 2020 | $970,000 | $0 | $1,134,000 |
| 2021 | $700,000 | $0 | $1,265,000 |
| 2022 | $1,400,000 | $0 | $2,005,000 |
| 2023 | $797,000 | $0 | $1,395,000 |
| 2024 | $772,000 | $0 | $1,457,000 |
| **TOTAL** | **$4,639,000** | **$0** | **$7,256,000** |

191. Based on the above table, during the Class Period (excluding 2020) through 2024, **over $3.7 million** was improperly steered from paying RKA costs and instead used to benefit the Company. During this same time period $6.1 million remained as forfeiture balance in aggregate. That means at least $2.4 million was left unused in the forfeiture accounts when these funds should have been used to offset the Plan's RKA costs.

192. Defendants effectively placed their own interests above the interests of the Plan and its participants and caused harm to the Plan and its participants by reducing Plan assets, not allocating forfeited funds to Plan participants' accounts, and also caused Plan participants to incur

at least $3.7 million in expenses that could otherwise have been covered in whole or in part by forfeited funds. This was both a breach of the duty of prudence as well as duty of loyalty.

### E. Interdependent Recordkeeping Compensation, Forfeiture Allocations, and Participants' Sole Financial Interests

193. The foregoing allegations concern recurring, interdependent decisions affecting what Plan participants paid, what the recordkeeper received, and how forfeited Plan assets were used. In evaluating recordkeeping and administrative fees, Defendants were required to examine not only charges deducted directly from participant accounts, but also the indirect compensation Great-West/Empower allegedly received from Plan investments and whether, and to what extent, that compensation reduced amounts otherwise charged for Plan services.

194. During the Class Period, Defendants caused Plan participants to pay the Plan's RKA fees reported as direct compensation through deductions from their retirement accounts. The charges continued while Great-West/Empower also received indirect compensation from Plan investments as alleged above. Defendants failed to consider whether that indirect compensation should have been credited against the fees borne by participants and whether those fees could have been reduced further.

195. In every year of the Class Period up to 2024, Defendants maintained an unbroken pattern of using forfeitures to reduce Citizens' employer contribution obligations while allocating none of those forfeitures to offset the RKA fees paid by Plan participants. Defendants continued this pattern despite the competing permitted use of forfeitures for Plan expenses, and failed to evaluate that alternative solely in participants' financial interests.

****

196. Given the totality of the above circumstances Defendants breached their fiduciary duties to the Plan and its participants.

## COUNT I

**Breaches of Fiduciary Duty of Prudence Regarding Investments and RKA (against the Committee)**

197. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

198. At all relevant times, the Committees and their members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

199. As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

200. The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. The Prudence Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite poor performance and other indicia in relation to other comparable investments.

201. The Prudence Defendants failed to employ a disciplined, contemporaneous, participant-centered methodology for selecting and monitoring the Challenged Funds. As detailed above, Defendants selected and continued to retain those investments despite repeated, materially

inferior comparisons with available investment alternatives over relevant periods. Defendants failed to evaluate the comparative risk, return, cost, investment objectives, and other material characteristics of those alternatives individually and interdependently before making and maintaining those investment selections. These failures caused Plan participants to remain invested in the Challenged Funds instead of the more favorable alternatives identified herein, resulting in the losses alleged above.

202. The Prudence Defendants also failed to prudently review the Plan's recordkeeping and administration fees to ensure the Plan and its participants only paid reasonable fees.

203. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to lower net investment returns and excessive RKA costs.

204. Had the Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

205. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

206. The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

**COUNT II**

**Breaches of Fiduciary Duty of Prudence Regarding Use of Forfeitures (against the Company and Committee)**

207. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

208. At all relevant times, the Company and Committee and their members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

209. As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

210. The Prudence Defendants breached these fiduciary duties by failing to act in the sole interest of the Plan and its participants by failing to defray the excessive Plan costs through allocation of forfeiture funds to pay for the Plan's RKA.

211. As a direct and proximate result of these breaches of fiduciary duties, the Plan suffered millions of dollars in losses, and thus deprived the Plan's participants of savings that would have otherwise increased the value of their Plan accounts.

212. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must

restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

213. The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

## COUNT III
## Breach of Fiduciary Duty of Loyalty Regarding Use of Forfeitures
## (Against the Company and Committee)

214. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

215. At all relevant times, the Company and Committee ("Loyalty Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

216. As fiduciaries of the Plan, the Loyalty Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).

217. Pursuant to 29 U.S.C. § 1104(a)(1)(A), the Loyalty Defendants were required to discharge their duties to the Plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

218. The Loyalty Defendants failed to exercise their duty of loyalty to the Plan and its participants by utilizing forfeited funds in the Plan for the benefit of Citizens instead of the sole interest of the Plan participants and beneficiaries.

219. The Loyalty Defendants used these Plan assets for the purpose of reducing Citizens' contributions to the Plan, thereby saving Citizens millions of dollars each year at the expense of the Plan which received decreased employer contributions, and its participants and beneficiaries were forced to incur avoidable expense deductions to their individual accounts.

220. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars in losses.

221. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

222. The Loyalty Defendants are also liable for the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT IV**
**Failure to Monitor Other Fiduciaries**
**(against the Company and CHRC)**

223. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

224. Citizens and the CHRC (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee, and were aware that the Committee had critical responsibilities as fiduciaries of the Plan.

225. In light of this authority, the Monitoring Defendants had a duty to monitor the Committee to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

226. The Monitoring Defendants also had a duty to ensure that the members of the Committee possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company.

227. The Monitoring Defendants breached their fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions.

228. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

229. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

**COUNT V**
**Prohibited Transactions**
**(Against All Defendants)**

230. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

231. ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or

should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

232. ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

233. ERISA § 3(9), 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

234. Defendants' decision to agree to pay excessive fees to Great-West/Empower as recordkeeper for the Plan amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

235. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E. An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F. Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G. An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I. An award of pre-judgment interest;

J. An award of costs pursuant to 29 U.S.C. § 1132(g);

K. An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L. Such other and further relief as the Court deems equitable and just.

Dated: October 19, 2026

Respectfully submitted,

*/s/ Sonja L. Deyoe*

Sonja L. Deyoe, Esquire
RI Attorney ID #6301
**LAW OFFICES OF SONJA J. DEVOE**
395 Smith Street
Providence, RI 02908
Tel: (401) 864-5877
Email: sld@the-straight-shooter.com

Mark K. Gyandoh, Esquire
(*Pro Hac Vice* to be requested)
James A. Maro, Esquire
(*Pro Hac Vice* to be requested)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Tel: (610) 890-0200
Email: markg@capozziadler.com
jamesm@capozziadler.com

*Counsel for Plaintiff and the Putative Class*